UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NEW YORK HOTEL AND GAMING TRADES
COUNCIL, AFL-CIO,

                             Petitioner,

               -v.-

123 WASHINGTON LLC, *doing business as*
THE WASHINGTON, *formerly known as* W
NEW YORK DOWNTOWN, and LUXURBAN
HOTELS, INC., *formerly known as*
CORPHOUSING LLC,

                       Respondents.

---

24 Civ. 7213 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

      Pending before this Court is the motion for summary judgment of Petitioner New York Hotel and Gaming Trades Council, AFL-CIO ("Petitioner" or "Union"), which seeks an order confirming four arbitration awards, namely, the Monetary Award, the LuxUrban Supplemental Award, the Washington Supplemental Award, and the Drawdown Award, as defined below (collectively, the "Awards"), issued by the Office of the Impartial Chairperson ("OIC") against Respondents 123 Washington, LLC ("Washington") and LuxUrban Hotels Inc. ("LuxUrban"). Respondents argue that the motion to confirm the Awards should be denied because the Awards are irrational and violate New York public policy. For the reasons set forth in the remainder of this Opinion, the Court grants Petitioner's motion to confirm, as well as its requests for pre- and post-judgment interest and attorney's fees.

**BACKGROUND**[1]

**A.    Factual Background**

**1.    The Parties and Their Agreements**

Petitioner is a labor organization as defined under the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 152(5).  (Pet. 56.1 ¶ 1).  It represents nearly 40,000 workers in the hotel, hospitality, and gaming industries in New York and Northern New Jersey, with offices at 707 Eighth Avenue, New York, New York 10036.  (*Id.*).

Respondent Washington owns the W New York Downtown Hotel, which is currently known as the "The Washington" (the "Hotel") located at 8 Albany Street, New York, New York, 10006.  (Pet. 56.1 ¶ 2).  Respondent LuxUrban is a foreign corporation located in Miami, Florida.  (*Id.* ¶ 3).  LuxUrban has been known by several names.  It started as "CorpHousing LLC" and changed its name to "CorpHousing Group Inc." on January 4, 2022.  (*Id.* ¶ 4).  "CorpHousing Group Inc." then changed its name to "LuxUrban Hotels Inc." on

---

[1]    This Opinion draws its facts from the Amended Verified Petition to Confirm a Labor Arbitration Award ("Amended Petition" (Dkt. #15)); Petitioner's Local Civil Rule 56.1 Statement of Material Facts ("Pet. 56.1" (Dkt. #18)); the Declaration of Amy Bokerman and the exhibits attached thereto ("Bokerman Decl., Ex. [ ]" (Dkt. #17)); Petitioner's Memorandum of Law in Support of Its Motion for Summary Judgment ("Pet. Br." (Dkt. #19)).  As appropriate, the Court also relies on Respondents' Memorandum of Law in Opposition to Petitioner's Motion for Summary Judgment ("Resp. Opp." (Dkt. #25)); the exhibits attached thereto ("Resp. Opp., Ex. [ ]"); and Petitioner's Reply Memorandum of Law in Further Support of Its Motion ("Pet. Reply" (Dkt. #26)).

The Court also draws facts from Award No. 2024-05Supp (the "Supplemental Award" (Dkt. #17-1)), Award No. 2024-98Supp (the "LuxUrban Supplemental Award" (Dkt. #17-2)), Award No. 2024-104Supp (the "Washington Supplemental Award" (Dkt. #17-3)), and Award No. 2024-121 (the "Drawdown Award" (Dkt. #17-16)), each of which is attached to the Amended Petition.

November 1, 2022.  (*Id.*).  According to Respondents, LuxUrban operates the Hotel owned by Respondent Washington.  (Resp. Opp. 5).[2]

Petitioner "negotiates and enforces terms and conditions of employment for the thousands of workers it represents through an industry wide collective bargaining agreement between the Union and the Hotel Association of New York City, Inc., commonly known as the Industry Wide Agreement ('IWA')." (Pet. 56.1 ¶ 6).  The IWA contains a broad grievance and arbitration provision. (*Id.* ¶ 8).  Specifically, Article 26 of the IWA states:

> (A) All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties, directly or indirectly, which shall not have been adjusted by and between the parties involved shall be referred to a permanent umpire(s) to be known as the Impartial Chairperson, and his/her decision shall be final and binding upon the parties hereto.  Any questions regarding arbitrability, substantive, procedural, or otherwise, or regarding the Impartial Chairperson's jurisdiction or authority, shall be submitted to the Impartial Chairperson in accordance with this Article.
>
> (B) In the event of a willful default by either party in appearing before the Impartial Chairperson, after due written notice shall have been given to said party, the Impartial Chairperson is hereby authorized to render a decision upon the testimony of the party appearing.

---

[2]    Respondents' brief was submitted with pages that are out of order.  For clarity, the Court refers to the page numbers as they appear in the brief's intended sequence, not the order in which the pages were electronically filed.

(*Id.*).  Pursuant to that provision, all disputes "under the IWA or industry practices" are referred to a "permanent panel of industry expert arbitrators," known as the OIC.  (*Id.* ¶ 7).

Between October 2010 and October 2023, the Union and Washington entered into a series of agreements.  *First*, "[i]n October 2010, the Union and Washington entered into an [a]ssumption [a]greement … whereby Washington agreed to adopt and be bound by the IWA and any successor IWA[,]" namely, the "2010 Assumption Agreement."  (Pet. 56.1 ¶ 9; Bokerman Decl., Ex. E).  The "2010 Assumption Agreement incorporates the IWA's grievance and arbitration provision."  (Pet. 56.1 ¶ 11; Bokerman Decl., Ex. E ¶ 26).  The 2010 Assumption Agreement also includes a "no loss" provision that states: "No Loss: No current employee shall suffer a reduction in hours, hourly or weekly wages, benefits or fringe benefits, or other adverse [e]ffect on terms and conditions of employment as a result of this agreement."  (Pet. 56.1 ¶ 10; Bokerman Decl., Ex. E ¶ 15).

*Second*, in July 2015, Washington signed a Me-Too Agreement (the "2015 Me-Too Agreement"), "whereby Washington expressly adopted and agreed to bind itself on its own behalf and 'any current or future owner, operator, or manager, and their respective affiliated and related entities, successors, and assigns' to all the terms of a successor IWA."  (Pet. 56.1 ¶ 12; Bokerman Decl., Ex. F).  "The 2015 Me-Too Agreement [also] has a 'no loss' provision … and an OIC arbitration provision."  (Pet. 56.1 ¶ 13; Bokerman Decl., Ex. F at 1).

*Third*, in September 2020, "Washington entered into an agreement with the Union binding its future managing agent to the IWA" (the "2020 Successor Agreement").  (Pet. 56.1 ¶ 14; Bokerman Decl., Ex. G).  This agreement "also incorporates the OIC arbitration provisions of the IWA."  (Pet. 56.1 ¶ 15; Bokerman Decl., Ex. G ¶ 4).

*Fourth*, in October 2021, after hiring a new managing agent, namely, Rebel Hospitality New York LLC, the Union and Washington entered into another agreement binding themselves to the IWA (the "2021 Assumption Agreement").  (Pet. 56.1 ¶ 16; Bokerman Decl., Ex. H).  The 2021 Assumption Agreement has a "no loss" provision and an arbitration provision.  (Pet. 56.1 ¶ 17; Bokerman Decl., Ex. H ¶¶ 1, 4).

*Fifth*, on November 15, 2022, Washington again appointed a new managing agent, Respondent LuxUrban, and signed another Assumption Agreement (the "2022 Assumption Agreement") with the Union to reaffirm its commitment to the IWA.  (Pet. 56.1 ¶ 18; Bokerman Decl., Ex. I).  "LuxUrban was also a party to the 2022 Assumption Agreement."  (Pet. 56.1 ¶ 19; Bokerman Decl., Ex. I at 1-2).  This agreement includes a "no loss provision" and an "OIC arbitration provision," binding both Washington and LuxUrban to the IWA and "those agreements and practices supplementing the IWA."  (Pet. 56.1 ¶ 20; Bokerman Decl., Ex. I ¶¶ 1, 4).

Finally, in October 2023, the parties entered into another agreement (the "2023 Agreement") which states:

> Challenging Decisions of the Arbitrator: The Hotel acknowledges that challenging an arbitration decision

5

does not excuse compliance with such decision.  It is agreed that if either party moves to vacate an arbitration decision, and the decision is subsequently confirmed in whole or in part, the party seeking to challenge the arbitration decision will pay the reasonable attorney's fees and costs of the other party.  It is further agreed that if either party moves to confirm an arbitration decision due to the non-moving party's failure to comply with the same, and the decision is subsequently confirmed in whole or in part, the non-moving party will pay the reasonable attorney's fees and costs of the other party.   It is understood that a request for reconsideration made to the Office of the Impartial Chairperson does not constitute a motion to vacate an arbitration decision.

(Pet. 56.1 ¶¶ 21, 23; Bokerman Decl., Ex. J ¶ 2).

### 2.    The Arbitration

Before the Union and Washington signed the 2010 Assumption Agreement, there was an existing agreement (the "2010 Tips Agreement") between and among beverage and food attendants ("B&F Attendants"), bartenders, and servers who worked in the living room bar and terrace of the Hotel.  (Pet. 56.1 ¶ 24; Bokerman Decl., Ex. K).  According to Petitioner, the 2010 Tips Agreement "memorialized an existing practice, [where] [s]ervers 'tipped out' to [b]artenders 15% of their tips, and the [s]ervers and [b]artenders each 'tipped out' to B&F Attendants 10% of their tips."  (Pet. 56.1 ¶ 25). Petitioner claims that on October 24, 2011, "the [b]artenders unilaterally changed the tip distribution agreements, reducing the amount of weekly gratuities tipped out to B&F Attendants from 10% to 5%" (the "2011 Tips Agreement").  (*Id.* ¶ 26; Bokerman Decl., Ex. L).  Petitioner notes that "[o]nly [b]artenders were parties to the 2011 Tips Agreement."  (Pet. 56.1 ¶ 27).

Petitioner further states that "Washington immediately implemented the 5% reduction in tip distribution for B&F Attendants," causing the B&F Attendants to complain to Washington and the Union. (*Id.* ¶¶ 28-29). In July 2015, the Union, the Hotel, and the B&F Attendants held a meeting where the 2011 Tips Agreement "was shown to the B&F Attendants for the first time." (*Id.* ¶ 30).

In June 2017, the Union opened a grievance regarding the reduction in tip distribution. (Pet. 56.1 ¶ 31). The parties were unable to resolve their dispute, causing Washington to file for arbitration in 2018. (*Id.* ¶ 32). In 2020, while the arbitration was pending, the Hotel closed due to the COVID-19 pandemic. (*Id.* ¶ 33). The Union and Washington attended hearings at the OIC on August 31, 2021; February 16, 2022; May 24, 2022; and July 21, 2022, before Impartial Chairperson ("IC") Elliott Shriftman. (*Id.* ¶ 34).

The OIC issued several awards related to this matter between May 2023 and October 2024. On May 5, 2023, IC Elliot Shriftman issued Award No. 2023-56 (the "Liability Award"), which decided only the issue of liability regarding the reduction in tip distribution. (Pet. 56.1 ¶ 35; Bokerman Decl., Ex. M). In the Liability Award, IC Elliot Shriftman found that, "consistent with several OIC precedents and logic and fairness, the Hotel violated the agreement with the Union and the 2010 [Tips A]greement between the [s]ervers, [b]artenders, and B&F Attendants," and, further, that "the unilateral change made by [the b]artenders in 2011 … was wrongful." (Bokerman Decl., Ex. M at 10; Pet. 56.1 ¶ 36). IC Elliot Shriftman "direct[ed] the parties to meet to attempt to resolve the amount of lost earnings to be paid to the B&F

Attendants." (Bokerman Decl., Ex. M at 10-11; Pet. 56.1 ¶ 37). The parties were unable to reach an agreement "on the appropriate look-back period for the calculation of damages." (Pet. 56.1 ¶ 38; *see also* Bokerman Decl., Ex. A at 2).

On January 23, 2024, IC Elliot Shriftman issued Award No. 2024-05Supp (the "Monetary Award") and determined that the appropriate look-back period should be two years from December 2015. (Pet. 56.1 ¶ 39; Bokerman Decl., Ex. A at 2). IC Elliot Shriftman ordered Washington to pay the B&F Attendants a total of $60,000, but found no basis to impose liquidated damages. (Pet. 56.1 ¶ 39; Bokerman Decl., Ex. A at 2). According to Petitioner, Respondent LuxUrban agreed to pay the amount required under the Liability Award and Monetary Award issued against Washington. (Pet. 56.1 ¶ 41; *see also* Bokerman Decl., Ex. O at 3-4 (IC Aaron Shriftman finding that LuxUrban was liable for "backpay and liabilities")). Union counsel contacted Hotel counsel requesting that three checks be made out to three B&F Attendants in the amount of $20,000 each. (Pet. 56.1 ¶ 40).

In March 2024, the Union initiated an emergency arbitration at the OIC, asserting that LuxUrban had failed to comply with several OIC arbitration awards, including the Liability Award and Monetary Award issued against Washington. (Pet. 56.1 ¶ 41). Hearings were held on March 13, 2024, and April 29, 2024. (*Id.* ¶ 42). On July 11, 2024, IC Aaron Shriftman issued Award No. 2024-86 (the "Bond Award") against LuxUrban, stating that LuxUrban had "repeatedly demonstrat[ed] an inability to fulfill its regular contractual

8

obligations at [its] properties." (Bokerman Decl., Ex. O at 2; Pet. 56.1 ¶ 44).

He also referenced a March 25, 2024 email exchange between the Union and

the Vice President of Operations for LuxUrban, wherein the Union reiterated

"the Hotel's promise" to pay the amounts owed. (Bokerman Decl., Ex. O at 3-4;

Pet. 56.1 ¶ 46). IC Aaron Shriftman thus found that LuxUrban was bound by

the IWA and had "stepped into the shoes of the predecessor with respect to

backpay and liabilities." (Bokerman Decl., Ex. O at 3-4; Pet. 56.1 ¶ 45). IC

Aaron Shriftman "ordered LuxUrban to pay the outstanding $60,000 required

by the Liability Award and [Monetary] Award in addition to a[ ] 115% penalty,

comprised of a 15% contractual penalty for willful nonpayment under the IWA

and a 100% penalty for unpaid back wages pursuant to New York State Labor

Law." (Pet. 56.1 ¶ 47; *see also* Bokerman Decl., Ex. O at 4-5).

On August 14, 2024, IC Aaron Shriftman issued Award No. 2024-

98Supp (the "LuxUrban Supplemental Award"), which reiterated that LuxUrban

was responsible for paying $60,000, in addition to a 115% penalty to the B&F

Attendants, and clarified the reason for the 115% penalty. (Pet. 56.1 ¶¶ 48-49;

Bokerman Decl., Ex. B). LuxUrban had been given seven days to respond to

the Union's email request to IC Aaron Shriftman that the LuxUrban

Supplemental Award be issued, and did not respond. (Pet. 56.1 ¶¶ 50-51;

Bokerman Decl., Ex. B at 2-3). Accordingly, the LuxUrban Supplemental

Award was issued, which award included the 15% contractual penalty and

100% penalty on unpaid back wages for "willful nonpayment." (Bokerman

Decl., Ex. B at 3).

On August 26, 2024, IC Randi Lowitt issued Award No. 2024-104Supp (the "Washington Supplemental Award"), directing Washington to pay the previous $60,000 in addition to the 115% penalty "'based on LuxUrban's default' pursuant to Article 26(B) of the IWA." (Pet. 56.1 ¶¶ 52-54 (quoting Bokerman Decl., Ex. C at 2)). In effect, these two awards reiterated that Respondents were responsible for paying the amounts outlined in the Monetary Award plus a 115% penalty. (Resp. Opp. 5-6).

Finally, on October 11, 2024, IC Aaron Shriftman issued Award No. 2021-121 (the "Drawdown Award"), ordering a "drawdown of the cash bond posted with the [OIC]" to pay the amounts due to the employees pursuant to the previous Awards. (Bokerman Decl., Ex. P at 3; Pet. 56.1 ¶ 55). Though LuxUrban was given an opportunity, and even an extension, to respond to the Union's request for the OIC to order a drawdown on the cash bond, LuxUrban had again failed to respond. (Pet. 56.1 ¶ 56; *see also* Bokerman Decl., Ex. P at 2). The Award states that "[c]onsistent with IWA Article 46, the Employer is directed to replenish the cash bond in the amount of the drawdown, including the paying of any monies that it is ordered to pay in pending court actions." (Bokerman Decl., Ex. P at 3; Pet. 56.1 ¶ 58). Of note, however, the Drawdown Award made clear that it "d[id] not relieve the Employer of its obligations to fully comply with and pay all of the amounts due under any of the decisions for which it was found liable by [the OIC]." (Bokerman Decl., Ex. P at 3; Pet. 56.1 ¶ 59). To date, Respondents have not paid any of the abovementioned awards. (Pet. 56.1 ¶¶ 60-61).

10

## B.    Procedural Background

Petitioner initiated this proceeding by filing its initial petition to confirm three labor arbitration awards on September 24, 2024.  (Dkt. #1).  On September 26, 2024, this Court ordered Petitioner to move for confirmation of the arbitral awards in the form of a motion for summary judgment.  (Dkt. #8). On October 23, 2024, Petitioner filed its Amended Petition to confirm four arbitral awards, the operative petition in this action.  (*See generally* Amended Petition).  Specifically, Petitioner seeks confirmation of the Monetary Award, the LuxUrban Supplemental Award, the Washington Supplemental Award, and the Drawdown Award.  (Amended Petition ¶ 1).  Petitioner also filed its motion for summary judgment, memorandum of law in support thereof, Local Civil Rule 56.1 statement, and supporting declaration of Amy Bokerman with exhibits. (Dkt. #16-19).

On November 20, 2024, noting that the time for Respondents to file an opposition had passed, this Court directed Respondents to respond to Petitioner's motion on or before December 11, 2024.  (Dkt. #22).  Respondents did not file a response, and this Court issued a second order directing Respondents to respond on or before January 16, 2025, or the Court would consider the motion unopposed.  (Dkt. #23).  On January 16, 2025, Respondents filed their response in opposition to the motion for summary judgment.  (Dkt. #25).  Petitioner filed its reply on January 23, 2025.  (Dkt. #26).

**DISCUSSION**

**A.    Applicable Law**

"Section 301 of the [LMRA] … provides federal courts with jurisdiction over petitions brought to confirm labor arbitration awards." *Loc. 802, Assoc. Musicians of Greater N.Y.* v. *Parker Meridien Hotel*, 145 F.3d 85, 88 (2d Cir. 1998) (citing *Harry Hoffman Printing, Inc.* v. *Graphic Commc'ns, Int'l Union, Loc. 261*, 912 F.2d 608, 612 (2d Cir. 1990); 29 U.S.C. § 185 (1994)).  Federal court review of arbitral awards is "severely limited so as not to frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *United Bhd. of Carpenters & Joiners of Am.* v. *Tappan Zee Constructors, LLC*, 804 F.3d 270, 274-75 (2d Cir. 2015) (internal quotation marks and citation omitted).  "The federal policy in favor of enforcing arbitration awards is particularly strong with respect to arbitration of labor disputes." *N.Y. Hotel & Motel Trades Council* v. *Hotel St. George*, 988 F. Supp. 770, 774 (S.D.N.Y. 1997) (citing *United Paperworkers Int'l Union* v. *Misco, Inc.*, 484 U.S. 29, 37 (1987)).  Because the LMRA "embodies a 'clear preference for the private resolution of labor disputes,'" *Nat'l Football League Mgmt. Council* v. *Nat'l Football League Players Ass'n*, 820 F.3d 527, 536 (2d Cir. 2016) (quoting *Int'l Bhd. of Elec. Workers* v. *Niagara Mohawk Power Corp.*, 143 F.3d 704, 714 (2d Cir. 1998)), judicial review of arbitral awards in this context is "among the most deferential in the law," *id.* at 532.

Confirmation of an arbitration award is thus generally "a summary proceeding that merely makes what is already a final arbitration award a

12

judgment of the court[.]" *D.H. Blair & Co., Inc.* v. *Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (internal quotation marks and citation omitted).  In this Circuit, "[t]he showing required to avoid summary confirmation of an arbitration award is high." *Willemijn Houdstermaatschappij, BV* v. *Standard Microsys. Corp.*, 103 F.3d 9, 12 (2d Cir. 1997) (citing *Ottley* v. *Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987)).  But "[a]rbitration awards are not self-enforcing," and "they must be given force and effect by being converted to judicial orders by courts." *Power Partners MasTec, LLC* v. *Premier Power Renewable Energy, Inc.*, No. 14 Civ. 8420 (WHP), 2015 WL 774714, at *1 (S.D.N.Y. Feb. 20, 2015) (quoting *D.H. Blair & Co.*, 462 F.3d at 104).

    In considering a motion to confirm an arbitral award, "[t]he Court's task is not to reconsider the merits of the dispute; after all, the parties bargained for the arbitrator's view of the facts and the law." *Dist. Council of N.Y.C. & Vicinity of United Bhd. of Carpenters & Joiners of Am.* v. *Prime Contractors, Inc.*, No. 22 Civ. 7085 (KPF), 2023 WL 3849101, at *2 (S.D.N.Y. June 6, 2023) (citing *Nat'l Football League Mgmt. Council*, 820 F.3d at 536).  Rather, the Court's role is "simply to ensure that the arbitrator was 'even arguably construing or applying the contract and acting within the scope of his authority' and did not 'ignore the plain language of the contract.'" *Nat'l Football League Mgmt. Council*, 820 F.3d at 537 (quoting *Misco*, 484 U.S. at 38); *see also Major League Baseball Players Ass'n* v. *Garvey*, 532 U.S. 504, 509 (2001) ("It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may

be unenforceable." (quoting *United Steelworkers of Am.* v. *Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960))).  "The arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case.  Only a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm the award."  *D.H. Blair & Co.*, 462 F.3d at 110 (internal quotation marks and citations omitted).  In light of this deference and limited review, an arbitral award will normally be vacated "only upon finding a violation of one of the four statutory bases [enumerated in the Federal Arbitration Act], or, more rarely, if [the court] find[s] a panel has acted in manifest disregard of the law." *Porzig* v. *Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007) (citing *Wallace* v. *Buttar*, 378 F.3d 182, 189 (2d Cir. 2004)).[3]

## B.   Analysis

### 1.   Federal Law Is Controlling Under Section 301 of the LMRA

Respondents oppose Petitioner's motion to confirm the Awards by invoking New York Civil Practice Law and Rules ("CPLR") § 7511(b)(1)(iii); they assert that the arbitrators' decisions were "irrational" and "wrong on the law,"

---

[3]   By statute, an award may be vacated:

> [i] where the award was procured by corruption, fraud, or undue means; [ii] where there was evident partiality or corruption in the arbitrators, ...; [iii] where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or [iv] where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

and that the "arbitration awards are contrary to public policy." (Resp. Opp. 6-8). As an initial matter, Respondents are incorrect in asserting that CPLR § 7511(b)(1)(iii) is the controlling law.

Section 301 of the LMRA states, in relevant part, that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court in the United States having jurisdiction of the parties[.]" 29 U.S.C. § 185(a). The Supreme Court has interpreted "§ 301 as a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 209 (1985). "Thus, when a state claim alleges a violation of a labor contract, the Supreme Court has held that such claim is preempted by [§] 301 and must instead be resolved by reference to federal law." *Vera* v. *Saks & Co.*, 335 F.3d 109, 114 (2d Cir. 2003) (citing *Allis-Chalmers Corp.*, 471 U.S. at 210).

"Section 301 governs [i] claims founded directly on rights created by collective-bargaining agreements, and [ii] claims substantially dependent on analysis of a collective-bargaining agreement." *Loc. 794, Television Broad. Studio Emps. Union, I.A.T.S.E.* v. *Metro. Opera Ass'n, Inc.*, No. 21 Civ. 3821 (VEC), 2022 WL 992830, at *4 (S.D.N.Y. Mar. 31, 2022) (quoting *Caterpillar Inc.* v. *Williams*, 482 U.S. 386, 394 (1987)).

### a.    Respondents' Claims Are Founded Directly on Rights Created by a Collective Bargaining Agreement

Respondents' first claim, that the arbitration award should be vacated because it is "irrational" and "wrong on the law" (Resp. Opp. 6), is "founded directly on rights created by the [IWA]," *Metro. Opera Ass'n, Inc.*, 2022 WL 992830, at *4 (internal quotation marks omitted).  Respondents seek to contest awards issued by an arbitrator pursuant to an IWA.  Courts in this District have held that such a challenge is governed by § 301.  *See Metro. Opera Ass'n, Inc.*, 2022 WL 992830, at *4 (finding that petitioner was "seeking to enforce its right under the [collective bargaining agreement] to an arbitral decision that is rational and based in evidence and reason"); *see also Collaku* v. *Temco Serv. Indus., Inc.*, No. 18 Civ. 4054 (VEC), 2019 WL 452052, at *6 (S.D.N.Y. Feb. 5, 2019) ("To attack an arbitrator's award in a labor dispute as irrational under New York law, then, is essentially to assert that the arbitrator violated a duty implied into the parties' arbitration agreement — and is, therefore, an attack designed to vindicate a right created by the collective-bargaining agreement[.]" (internal quotation marks omitted and alterations adopted)).  Accordingly, Respondents' first argument under CPLR § 7511(b)(1)(iii) is completely preempted by § 301 of the LMRA.

In support of their second argument, that the arbitral awards are "against public policy," Respondents simply claim that "[f]or the OIC to ignore well-established law that is well-grounded in long-term rules, regulations, FAQs, and caselaw, and to impose its own standard, is a threat to … public

policy." (Resp. Opp. 9).  The Court finds that this argument is also preempted by § 301 because Respondents' public policy claim is essentially "a thinly veiled way of contending that the [A]ward[s] must be vacated because the Arbitrator acted irrationally."  *Metro. Opera Ass'n, Inc.*, 2022 WL 992830, at *4.  Because both of Respondents' purported bases for challenging the OIC decisions are "founded directly on rights" created by the IWA, they are both preempted by § 301 of the LMRA.

### b.    Respondents' Claims Are Substantially Dependent on an Analysis of the IWA

"Section 301 preempts not only claims directly alleging that a party has violated a provision of a [collective bargaining agreement], but also those state-law actions that require interpretation of the terms of a [collective bargaining agreement]."  *Kaye* v. *Orange Reg'l Med. Ctr.*, 975 F. Supp. 2d 412, 420 (S.D.N.Y. 2013) (quoting *McLean* v. *Garage Mgmt. Corp.*, No. 10 Civ. 3950 (DLC), 2011 WL 1143003, at *2 (S.D.N.Y. Mar. 29, 2011)).  Thus, "[w]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law."  *Vera*, 335 F.3d at 114 (quoting *Allis-Chalmers Corp.*, 471 U.S. at 220).

Respondents note that the 2010 Tips Agreement was created before the Union and Washington signed the 2010 Assumption Agreement, but ultimately argue that the OIC decisions to impose the Awards were irrational under New York State Hospitality Industry Wage Order §§ 146-2.15(a), 146-2.16(a) and

contrary to public policy.  (Resp. Opp. 5-9).  However, in the 2010 Assumption Agreement, the parties agreed that "[n]o current employee shall suffer a reduction in hours, hourly or weekly wages, benefits or fringe benefits, or other adverse [e]ffect on terms and conditions of employment as a result of this agreement."  (Pet. 56.1 ¶ 10; Bokerman Decl., Ex. E ¶ 15).  In the same agreement, the parties assumed and agreed to be bound by the IWA, which states that "[a]ll complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement … shall be referred to … the Impartial Chairperson, and his/her decision shall be final and binding upon the parties hereto."  (Pet. 56.1 ¶ 8).

Determining whether the OIC arbitrators correctly ruled in favor of Petitioner requires interpreting the text of the 2010 Assumption Agreement, which incorporates the IWA.  *First*, the IWA is a kind of "collective bargaining agreement" typically subject to § 301.  (Pet. 56.1 ¶ 6 (stating that the Union negotiates with employers via a "collective bargaining agreement … known as the Industry Wide Agreement")).  *Second*, IC Elliot Shriftman found that "consistent with several OIC precedents and logic and fairness, the Hotel violated the agreement with the Union and the 2010 [Tips Agreement] between the [s]ervers, [b]artenders, and B&F Attendants[.]"  (Bokerman Decl., Ex. M at 10; Pet. 56.1 ¶ 36).  His ruling was based on the contracts and, therefore, the disputes are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract."  *Vera*, 335 F.3d at 114.  Respondents' arguments before the Court are thus "inextricably

intertwined" with the interpretation of the parties' assumption agreements and the IWA. *Allis-Chalmers*, 471 U.S. at 213. Since Respondents' claims would require "interpretation, and not mere reference to" the IWA, they are preempted by § 301. *Greco* v. *Commc'ns Workers of Am., Loc. 1104*, 824 F. Supp. 2d 351, 356 (E.D.N.Y. 2011). In consequence, because all of Respondents' arguments are based on state law, the Court will examine each argument using comparable federal laws and precedent.

### 2.    The Arbitrator Did Not Manifestly Disregard the Law

"The Second Circuit has 'recognized … that an arbitral decision may be vacated when an arbitrator has exhibited a manifest disregard of law.'" *Platero* v. *Hyatt*, No. 22 Civ. 8680 (PAE), 2024 WL 342897, at *8 (S.D.N.Y. Jan. 30, 2024) (quoting *Jock* v. *Sterling Jewelers Inc.*, 646 F.3d 113, 121 (2d Cir. 2011)). "However, the 'manifest disregard' exception is rarely invoked successfully." *Id.* And "[m]ere error in the law or failure on the part of the arbitrator to understand or apply the law is not sufficient to establish manifest disregard of the law." *Id.* (quoting *Yusuf Ahmed Alghanim & Sons* v. *Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)). In order to vacate an arbitral award on the basis of manifest disregard, the moving party must show that:

> [i] the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators, [ii] the law was in fact improperly applied, leading to an erroneous outcome, and [iii] the arbitrator … kn[ew] of its existence, and its applicability to the problem before him.

*Id.* (internal quotation marks omitted and fourth alteration in original) (quoting *Duferco Int'l Steel Trading* v. *T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d

Cir. 2003)).  Even under this analysis, an "arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached."  *ISMT, Ltd.* v. *Fremak Indus., Inc.*, 634 F. App'x 332, 333 (2d Cir. 2016) (summary order) (quoting *Banco de Seguros Estado* v. *Mut. Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir. 2003) (quoting *Landy Michaels Realty Corp.* v. *Loc. 32B-32J, Serv. Emps. Int'l Union, AFL-CIO*, 954 F.2d 794, 797 (2d Cir. 1992))).

### a.    Respondents Have Not Shown That the Hospitality Industry Wage Order was Explicitly Applicable or Improperly Applied

In the context of a contract dispute, the standard for proving that an arbitrator has manifestly disregarded the law is "daunting."  *Platero*, 2024 WL 342897, at *8.  "[V]acatur for manifest disregard of a commercial contract is appropriate only if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract."  *Id.* (quoting *Westerbeke Corp.* v. *Daihatsu Motor Co.*, 304 F.3d 200, 222 (2d Cir. 2002)); *see also T. Co. Metals, LLC* v. *Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) ("With respect to contract interpretation, [the manifest disregard] standard essentially bars review of whether an arbitrator misconstrued a contract.").

Respondents have fallen short of showing that the arbitrators at the OIC "manifestly disregarded the law."  They argue that the OIC arbitrators ignored Hospitality Industry Wage Order §§ 146-2.15(a) and 146-2.16(a), which offer "a

clear set of rules that apply to tip pooling in New York." (Resp. Opp. 6). In support of this argument, they state that (i) under Hospitality Industry Wage Order § 146-2.15(a), "directly tipped employees may share their tips on a voluntary basis with other service employees," and (ii) under § 146-2.16(a), "directly tipped employees may mutually agree to pool their tips on a voluntary basis and to redistribute the tips among directly tipped employees and indirectly tipped employees who participated in providing the service." (*Id.* at 6-7). Based on those provisions, they claim that the unilateral change made by the bartender employees to the tipping percentage was "exactly the kind of self-determination that the law contemplates," and that it was "contrary to the law and irrational" for the arbitrator to "decide that they did not have the right to change the distribution of their tips." (*Id.* at 7).

However, the parties also agreed under the 2010 Assumption Agreement that "[n]o current employee shall suffer a reduction in hours, hourly or weekly wages, benefits or fringe benefits, or other adverse [e]ffect on terms and conditions of employment as a result of this agreement." (Pet. 56.1 ¶ 10; Bokerman Decl., Ex. E ¶ 15). In granting the Liability Award, IC Elliot Shriftman found that "the Hotel violated the agreement with the Union and the 2010 [Tips A]greement between the [s]ervers, [b]artenders, and B&F Attendants leaving no doubt that [s]ervers and [b]artenders were each to give ten (10%) percent of their gratuities to B&F Attendants." (Bokerman Decl., Ex. M at 10). He also stated that "the unilateral change made by [b]artenders in 2011 ... was wrongful," and that "management ... turned a deaf ear to their protests and a

blind eye to the twenty (20%) percent agreement which itself confirmed [a] past practice." (*Id.*).

The Court finds that IC Elliot Shriftman was justified in imposing liability on Respondents. *First*, the Hospitality Industry Wage Order states that "directly tipped employees may *mutually* agree to … redistribute the tips," § 146-2.16(a) (emphasis added), and in this case, the bartenders *unilaterally* adjusted the tip distribution (Pet. 56.1 ¶ 26). *Second*, the parties committed themselves to the IWA and the 2010 Assumption Agreement, each of which states that no employee will suffer a reduction in wages. (Pet. 56.1 ¶ 10; Bokerman Decl., Ex. D at 11). Thus, this Court cannot conclude that IC Elliot Shriftman "manifestly disregarded the law" in determining that Respondents breached their contractual obligations.

### b.    Respondents Have Not Shown That the Arbitrator Knew of the Hospitality Industry Wage Order's Applicability

Even if Hospitality Industry Wage Order §§ 146-2.15(a) and 146-2.16(a) clearly pertained to this case and were improperly applied, Respondents have nonetheless failed to show that IC Elliot Shriftman knew of their applicability. Petitioner argues that the Respondents' "interpretation [of those provisions of the Hospitality Industry Wage Order] is neither acknowledged in the Liability Award nor argued in the Hotel's post-hearing brief[.]" (Pet. Reply 6). Indeed, in the post-hearing brief that was before IC Elliot Shriftman in advance of his issuance of the Liability Award, Respondents argued that the 2011 Tips Agreement "should be validated under three (3) scenarios." (*See* Bokerman

Decl., Ex. M at 6-11). The brief primarily articulated a legal argument regarding the doctrine of laches and did not at any point discuss the Hospitality Industry Wage Order, including the two provisions on which Respondents now rely. (*See id.*). Accordingly, Respondents have not demonstrated that IC Elliot Shriftman knew of the existence of the Hospitality Industry Wage Order and its purported applicability to this case.[4]

### c. The Arbitrator Did Not Manifestly Disregard the New York Labor Law

Next, in support of their argument that IC Aaron Shriftman "manifestly disregarded the law," Respondents claim that the OIC incorrectly imposed the penalties on Respondents available under the IWA and the New York Labor Law. (Resp. Opp. 7-8). In particular, Respondents state that the "New York Labor Law ... requires unpaid wages to be due in order for penalties to be imposed and requires the Employer to have willfully refused to pay their workers. Here neither is the case." (*Id.* at 7). In support of this claim, Respondents argue simply that "the 15% penalty [and] 100% statutory penalty for unpaid back wages is redundant, overly punitive, contrary to the laws pursuant to which they were granted, and irrational." (*Id.* at 8). However, in the LuxUrban Supplemental Award, IC Aaron Shriftman clearly states that

---

[4]     Moreover, Respondents have waived this argument. *See Mandarin Oriental Mgmt., (USA) Inc.* v. *N.Y. Hotel & Motel Trades Council, AFL-CIO,* No. 13 Civ. 3984 (RMB), 2014 WL 345211, at *8 (S.D.N.Y. Jan. 31, 2014) ("[P]ermitting a party to oppose confirmation of an award based on a claim that it did not raise before the arbitrator would ... offend the general principle that a party 'cannot remain silent, raising no objection during the course of the arbitration proceedings, and when an award adverse to him has been handed down complain of a situation of which he had knowledge from the first.'" (quoting *N.Y. Hotel & Motel Trades Council* v. *Hotel St. George,* 988 F. Supp. 770, 778 (S.D.N.Y. 1997) (further citation omitted))).

penalties were imposed based on Respondents' "willful nonpayment …
pursuant to New York State Labor Law." (Bokerman Decl., Ex. B at 3).
Considering the highly deferential standard of review given to the decisions of
arbitrators, the Court finds IC Aaron Shriftman's rationale to be at least a
"colorable justification for the outcome reached." *ISMT, Ltd.*, 634 F. App'x at
333.

### 3.    The Awards Are Not Contrary to Public Policy

Respondents next argue that the Awards violate public policy and should
be vacated on that basis. (Resp. Opp. 8-9). "[A] court may refuse to enforce an
arbitrator's award under a collective bargaining agreement if the award is
contrary to public policy." *Newsday, Inc.* v. *Long Island Typographical Union,
No. 915*, 915 F.2d 840, 844 (2d Cir. 1990) (citing *Misco*, 484 U.S. at 42); *W.R.
Grace & Co.* v. *Loc. Union 759, Int'l Union of Rubber, Cork, Linoleum, & Plastic
Workers*, 461 U.S. 757, 766 (1983). However, "[a] remedy violates public policy
only when it creates an explicit conflict with other laws and legal precedents"
and thus clearly violates an identifiable public policy. *Riverbay Corp.* v. *Serv.
Emps. Int'l Union, Loc. 32BJ*, No. 22 Civ. 10994 (LJL), 2023 WL 3738984, at *5
(S.D.N.Y. May 31, 2023) (internal quotation marks omitted) (quoting *Misco*, 484
U.S. at 43) (citing *Niagara Mohawk Power Corp.*, 143 F.3d at 719).

In support of their argument that the Awards violate public policy,
Respondents cite several state court cases from which they argue that "New
York State has a strong public policy interest in making sure the laws it
passes … are applied consistently across all jurisdictions." (Resp. Opp. 8-9).

They assert that "[f]or the OIC to ignore well-established law that is well-grounded in long-term rules, regulations, FAQs, and caselaw, and to impose its own standard, is a threat to [ ] public policy." (*Id.*). But Respondents have cited no specific "identifiable public policy" that the arbitrators ignored. *See Riverbay Corp.*, 2023 WL 3738984, at *5. They reference only that the Awards "all stem[ ] from the same erroneous interpretation of the 'tip pooling' laws[.]" (Resp. Opp. 8). As such, Respondents' argument fails. *See E. Associated Coal Corp.* v. *United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000) ("Any such public policy must be explicit, well defined, and dominant, and it must be ascertained by reference to the laws and legal precedents, not from general considerations of supposed public interests." (internal quotation marks omitted)); *Saint Mary Home, Inc.* v. *Serv. Emps. Int'l Union, Dist. 1199*, 116 F.3d 41, 46 (2d Cir. 1997) ("[C]ourts may refuse to enforce arbitral awards only in those rare cases when enforcement of the award would be directly at odds with a well defined and dominant public policy resting on clear law and legal precedent.").

Further, to the extent that Respondents are arguing that the Awards create an explicit conflict with the Hospitality Industry Wage Order, the Court finds that the Awards did not clearly violate public policy. The Court agrees with Petitioner that the purpose of the Hospitality Industry Wage Order "is to protect workers in the hospitality industry," and that the Awards furthered that purpose by ensuring that Respondents paid the B&F Attendants the tips that they were owed under the mutually-agreed-to 2010 Tips Agreement. (Pet.

25

Reply 9).  Accordingly, the Court will not deny Petitioner's motion to confirm the Awards on this basis.

### 4.    Respondents Failed to Bring a Timely Motion to Vacate

Finally, even if Respondents' arguments were meritorious, they have failed to bring a timely motion to vacate the Awards.  "Because LMRA § 301 does not prescribe a statute of limitations for commencing an action to challenge an arbitrator's ruling, the applicable statute of limitations is borrowed from the relevant state statute."  *N.Y.C. Dist. Council of Carpenters Pension Fund* v. *Dafna Constr. Co. Inc.*, 438 F. Supp. 2d 238, 240 (S.D.N.Y. 2006) (citing *Burns Int'l Sec. Servs., Inc.* v. *Int'l Union, United Plant Guard Workers of Am. (UPGWA) and Its Loc. 537*, 47 F.3d 14, 16 (2d Cir. 1995)).  The relevant state statute, CPLR § 7511(a), provides that a motion to vacate an arbitrator's award must be made "ninety days from the date of delivery of the award."  *Trs. of the N.Y.C. Dist. Council of Carpenters Pension Fund* v. *High Performance Floors Inc.*, No. 15 Civ. 781 (LGS), 2016 WL 3194370, *3 (S.D.N.Y. June 6, 2016) (citing *Parker Meridien Hotel*, 145 F.3d at 88)).

"The courts of New York interpret [CPLR §] 7511(a) to permit a defendant to assert affirmative defenses in response to a petition to confirm an arbitration award even if the defendant failed to timely challenge the award."  *Porter* v. *Thompson Roofing & Sheet Metal Co., Inc.*, 242 F.3d 367, 2000 WL 1761871, at *2 (2d Cir. 2000) (summary order).  However, the Second Circuit has "rejected the 'gloss' placed by New York courts on [CPLR §] 7511(a) because it 'is inimical to the important federal interests of promoting resolution of labor conflicts

26

quickly and effectively through arbitration.'" *Id.* (citing *Parker Meridien Hotel*, 145 F.3d at 89). The Second Circuit has further clarified that the ninety-day tolling period starts on the date the award is issued, and not when the winning party files to confirm the award. *See id.* at *3 (finding that "a defendant who fails to challenge an arbitration award within the applicable [ninety-]day statute of limitations forfeits any affirmative defenses in response to a petition to confirm that award"); *see also Parker Meridien Hotel*, 145 F.3d at 88-89 (holding that "grounds for vacating an arbitration award may not be raised as an affirmative defense after the period provided in the appropriate statute of limitations governing applications to vacate an arbitration award has lapsed").

As Petitioner notes, the Liability Award was issued on May 5, 2023; the Monetary Award was issued on January 23, 2024; the LuxUrban Supplemental Award was issued on August 14, 2024; the Washington Supplemental Award was issued on August 26, 2024; and the Drawdown Bond Award was issued on October 11, 2024. (Pet. 56.1 ¶¶ 35, 39, 48, 52, 55). Respondents filed their response in opposition to the motion to confirm the Awards on January 16, 2025, ninety-seven days after the issuance of the last Award. (Dkt. #25). Therefore, Respondents' motion is untimely and must be denied on that basis as well.

### 5. The Court Confirms the Awards

Finally, the Court notes that the Awards attached to the Union's petition demonstrate that the arbitrators provided adequate reasoning for the obligations and penalties imposed on Respondents. For instance, IC Aaron

Shriftman stated that he imposed penalties based on the "remedial powers of the OIC to compel compliance by repeat offenders of the IWA," observing that Respondent LuxUrban had "repeatedly demonstrat[ed] an inability to fulfill its regular contractual obligations at these properties." (Bokerman Decl., Ex. O at 3). "A court's review of a final arbitration award under the LMRA is 'very limited.'" *Dist. Council No. 9 Int'l Union of Painters & Allied Trades, AFL-CIO.* v. *City Newark Glass Co.*, No. 23 Civ. 9537 (GHW), 2024 WL 2783897, at *2 (S.D.N.Y. May 28, 2024) (quoting *Nat'l Football League Players Ass'n*, 820 F.3d at 536). And an arbitrator's "choice of remedies is subject to limited review." *NLRB* v. *Katz's Delicatessen*, 80 F.3d 755, 769 (2d Cir. 1996) (citing *NLRB* v. *Browne*, 890 F.2d 605, 607 (2d Cir. 1989)); *see also Chelsea Grand, LLC* v. *N.Y. Hotel & Motel Trades Council, AFL-CIO*, 729 F. App'x 33, 39 (2d Cir. 2018) (summary order) (finding that the OIC did not exceed its scope of authority in awarding "monetary and punitive damages").

Therefore, the Court finds that the arbitrators at the OIC acted within their authority when imposing penalties on the Respondents for their repeated failure to comply with previous Awards issued by the OIC. Exercising its limited power of review, the Court concludes that summary judgment confirming the Awards is appropriate. The OIC acted within its scope and made determinations that are supported by more than colorable justifications; Petitioner has demonstrated that there are no material disputed facts; and Respondents have failed to demonstrate that the Awards were irrational or contrary to public policy.

### 6.    The Court Awards Pre-Judgment Interest

The Union also seeks pre-judgment interest.  (Amended Petition 11).

"Post-award, prejudgment interest is generally awarded at the discretion of the

district court, and there is a presumption in favor of awarding such interest."

*In re Arb. Between Westchester Fire Ins. Co.* v. *Massamont Ins. Agency, Inc.*, 420

F. Supp. 2d 223, 226 (S.D.N.Y. 2005) (citing *In re Waterside Ocean Navigation*

*Co.* v. *Int'l Navigation, Ltd.*, 737 F.2d 150, 153-54 (2d Cir. 1984); *Irving R.*

*Boody & Co.* v. *Win Holdings Int'l, Inc.*, 213 F. Supp. 2d 378, 383 (S.D.N.Y.

2002)).  Overall, courts should award prejudgment interest if doing so would be

"fair, equitable[,] and necessary to compensate the wronged party fully."

*Wickham Contracting Co.* v. *Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-*

*CIO*, 955 F.2d 831, 835 (2d Cir. 1992) (collecting cases).  As explained

throughout this Opinion, the facts of this case call for the award of pre-

judgment interest.

"New York law provides for prejudgment interest running from the date of

an arbitration award until the entry of final judgment."  *Finger Lakes Bottling*

*Co.* v. *Coors Brewing Co.*, 748 F. Supp. 2d 286, 292 (S.D.N.Y. 2010) (citing

CPLR § 5002) (collecting cases).  In accordance with "the common practice

among the courts of this Circuit," the Court "set[s] the interest rate at 9%."

*N.Y.C. Dist. Council of Carpenters Pension Fund* v. *E. Millenium Const., Inc.*,

No. 03 Civ. 5122 (DAB), 2003 WL 22773355, at *3 (S.D.N.Y. Nov. 21, 2003);

*see also N.Y.C. Dist. Council of Carpenters* v. *Metro Furniture Servs. LLC*, No. 11

Civ. 7074 (HB), 2012 WL 4492384, at *3 (S.D.N.Y. Sept. 28, 2012) ("[T]he

common practice among courts within the Second Circuit is to grant interest at a rate of 9%, the rate of prejudgment interest under New York State law." (citing CPLR §§ 5001-04)). Accordingly, the Court grants pre-judgment interest of 9% from the date of the final Award, October 11, 2024, to the date of the judgment in this case.

### 7. The Court Awards Post-Judgment Interest

The Union also seeks post-judgment interest. (Amended Petition 11). "Section 1961 of Title 28 establishes the rate of interest that is to be paid 'on any money judgment in a civil case recovered in a district court,' linking that rate to the rate of interest the government pays on money it borrows by means of Treasury bills." *Jones* v. *UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000) (quoting 28 U.S.C. § 1961(a)). The Second Circuit has held that under Section 1961, awards of post-judgment interest are mandatory. *See Cappiello* v. *ICD Publ'ns, Inc.*, 720 F.3d 109, 113 (2d Cir. 2013) (collecting cases). Under 9 U.S.C. § 13, a judgment entered on a motion to confirm an arbitral award has "the same force and effect, in all respects, as … a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered." 9 U.S.C. § 13(c). Therefore, the Court grants Petitioner's request for interest to accrue at the statutory rate from the date judgment is entered until Respondents satisfy their payment obligations.

### 8. The Court Awards Attorney's Fees

Finally, Petitioner seeks attorney's fees. (Amended Petition 11). "Ordinarily, attorney's fees cannot be recovered in a federal action in the

absence of statutory authority, and neither [§] 301 of the LMRA nor the Federal Arbitration Act provide for attorney's fees in actions to confirm an arbitration award." *Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund* v. *Baroco Contracting Corp.*, No. 24 Civ. 1898 (DEH), 2024 WL 4519836, at *2 (S.D.N.Y. Oct. 17, 2024) (internal citations omitted).  However, pursuant to "its inherent powers to supervise and control its own proceedings, a district court has the authority to award attorney's fees to the prevailing party when the losing party 'has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Eisemann* v. *Greene*, 204 F.3d 393, 395 (2d Cir. 2000) (quoting *F.D. Rich Co.* v. *U.S. ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129 (1974)).  "In confirmation proceedings, 'the guiding principle has been stated as follows: [W]hen a challenger refuses to abide by an arbitrator's decision without justification, attorney's fees and costs may properly be awarded.'" *Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund* v. *JB Squared Constr. Corp.*, No. 20 Civ. 2659 (KPF), 2020 WL 6825693, at *5 (S.D.N.Y. Nov. 19, 2020) (quoting *Trs. of the N.Y.C. Dist. Council of Carpenters Pension Fund* v. *Mountaintop Cabinet Mfr. Corp.*, No. 11 Civ. 8075 (JMF), 2012 WL 3756279, at *4 (S.D.N.Y. Aug. 29, 2012) (quoting *N.Y.C. Dist. Council of Carpenters Pension Fund* v. *Angel Const. Grp., LLC*, No. 08 Civ. 9061 (RJS), 2009 WL 256009, at *2 (S.D.N.Y. Feb. 3, 2009))).

Furthermore, the parties expressly agreed that "if either party moves to confirm an arbitration decision due to the non-moving party's failure to comply with the same, and the decision is subsequently confirmed in whole or in part,

the non-moving party will pay the reasonable attorney's fees and costs of the other party." (Pet. 56.1 ¶ 23; Bokerman Decl., Ex. J ¶ 2). Accordingly, the Court finds that an award of attorney's fees is warranted. *See Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund* v. *J&V Locks & Doors, Inc.*, No. 25 Civ. 113 (AT), 2025 WL 1504695, at *3 (S.D.N.Y. May 27, 2025) (granting attorneys' fees where "the [collective bargaining agreement] provides for the recovery of reasonable attorneys' fees and costs incurred in this action."); *Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund* v. *Abba Constr. LLC*, No. 22 Civ. 5699 (JLR), 2022 WL 17555720, at *4 (S.D.N.Y. Dec. 9, 2022) ("Attorneys' fees and costs may be awarded if the parties contractually agreed as such." (collecting cases)).

Nonetheless, "[t]o support a request for attorneys' fees, petitioners must submit contemporaneous time records that 'specify the date, hours expended[,] and the nature of the work done by each attorney.'" *J&V Locks & Doors, Inc.*, 2025 WL 1504695, at *3 (quoting *Big R Food Warehouses* v. *Loc. 338 RWDSU*, 896 F. Supp. 292, 295 (E.D.N.Y. 1995)). Therefore, Petitioner's request for attorney's fees is granted, conditional on a timely motion for attorney's fees pursuant to Fed. R. Civ. P. 54(d)(2). *See Legacy Agency, Inc.* v. *Scoffield*, 559 F. Supp. 3d 195, 211 (S.D.N.Y. 2021) (granting attorney's fees and directing the petitioner to submit a Rule 54(d)(2) motion after judgment is entered, specifying the amount sought); *NTT Docomo, Inc.* v. *Ultra D.O.O.*, No. 10 Civ. 3823 (RMB), 2010 WL 4159459, at *11 (S.D.N.Y. Oct. 12, 2010) (awarding attorneys' fees

and referring the case to a magistrate judge to determine "the amount of costs and attorneys' fees which should be paid to [p]etitioner.").

## CONCLUSION

For the reasons set forth above, Petitioner's motion to confirm the four Awards is GRANTED. The Court also awards pre-judgment interest at 9% from the date of the last Award, October 11, 2024, to the date of the judgment in this case. Post-judgment interest will accrue at the statutory rate under 28 U.S.C. § 1961.

Reasonable attorney's fees for this proceeding are awarded to Petitioner, and Petitioner is directed to file a motion for attorney's fees pursuant to Fed. R. Civ. P. 54(d)(2). The motion will be is referred to Magistrate Judge Jennifer Willis to determine the amount of attorney's fees which should be paid to the Petitioner. The Clerk of Court is directed to terminate the pending motion at docket entry 16.

SO ORDERED.

Dated:     August 5, 2025
       New York, New York

                                     KATHERINE POLK FAILLA
                                 United States District Judge